UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LARRY KEMP and BRIAN WOODRING, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:14-cv-1728-SEB-DKL |
| | ) | |
| DAVID LIEBEL, | ) | |
| Indiana Department of Correction, | ) | |
| Director of Religious Services, | ) | |
| *in his individual capacity,* | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER ON CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT

This matter comes before us on cross Motions for Partial Summary Judgment filed by Plaintiffs Larry Kemp and Brian Woodring and by Defendant David Liebel. Dkt. Nos. 48 and 57, respectively. Plaintiffs, prisoners within the Indiana Department of Correction ("DOC"), seek an award of nominal and punitive damages against Mr. Liebel in his individual capacity for allegedly violating their First Amendment right to practice their religion through services and study for a period of time following their transfers from one DOC correctional facility to another. For the following reasons, we GRANT Defendant's Motion for Partial Summary Judgment and DENY the Motion for Partial Summary Judgment filed by Plaintiffs Larry Kemp and Brian Woodring.

## FACTUAL BACKGROUND

The parties stipulate that there are no contested issues of material fact in this case. Mr. Kemp and Mr. Woodring are Jewish. They were formerly confined at the Pendleton

Correctional Facility and, since April 2014, have been housed at the Wabash Valley Correctional Facility in Carlisle, Indiana.

DOC inmates who adhere to certain religions, including Judaism, are permitted to pray and worship as a group. Pursuant to DOC policy, "[o]ffenders shall be free to practice and adhere to the requirements of a personal religious belief within the limitations of [Department] policy and administrative procedure." DOC Policy and Administrative Procedure, Dkt. No. 17-4 at 2. Regarding Judaism specifically, the DOC Handbook of Religious Beliefs and Practices recognizes the importance of congregate worship and study to its adherents. DOC Handbook of Religious Beliefs and Practices, Dkt No. 17-3 at 5. "Jewish services may be led by trained lay persons as well as by Rabbis, teachers of Judaism and spiritual leaders of congregations," though Jewish services need not necessarily be led by a rabbi or other religious leader. *Id.* at 3, 6.

DOC administrative policy provides that "[t]o protect the integrity and authenticity of belief and practice, Chaplains, religious specialists or qualified volunteers, shall provide leadership of religious programs whenever possible." DOC Policy and Administrative Procedure at 3. The DOC employs chaplains at its various facilities. On a regular basis, the chaplains lead Christian services, but they do not do so for other religious traditions. In the case of services for other religious traditions,

> [w]hen a staff Chaplain is not empowered to conduct a religious
> program or ceremony according to the tenants of a particular faith
> or custom, and there is sufficient offender interest, the Chaplain or
> the Community Involvement Coordinator may seek to recruit
> appropriate individual(s) from the community.

*Id.* at p. 3. When a suitable leader is not available, the facility's superintendent or designee may select an offender to facilitate the group's religious services. *Id.* However, "[w]hen possible, facilities shall consult with outside authorities before selecting offender facilitators." *Id.*

Wabash Valley imposes an additional requirement for inmates to lead or facilitate services where a chaplain or an outside volunteer is not available to do so. Before leading such services, an inmate must have been certified by an outside religious authority as sufficiently knowledgeable to conduct a service. Further, any offender serving as a leader of religious services must also have resided at the facility for a certain length of time under good behavior and be approved by the Security Threat Group Coordinator.

At Pendleton Correctional Facility Mr. Kemp and Mr. Woodring along with other offenders attended weekly services and study for Jewish prisoners. They and other offenders who participated in Jewish services and study were visited once a month by rabbis from the Lubavitch of Indiana, a group of Orthodox Jewish practitioners, who had contracted with Pendleton and three additional DOC correctional facilities. Offenders led other services and study sessions for Jewish adherents.

In addition to attending Jewish services and study sessions at Pendleton Correctional Facility, Mr. Kemp, Mr. Woodring, and certain other offenders were

authorized to receive kosher meals beginning in 2010.[1] When DOC first offered

kosher meal service, the food was pre-packaged in the style of TV dinners. In

2013, DOC created what it describes as separate kosher kitchens in four of its

facilities, including Wabash Valley. This decision was made because preparing

meals certified as kosher by appropriate religious authorities selected by DOC in

one of the special kosher kitchens is less expensive than providing pre-packaged

meals. Several DOC officials, including Defendant Liebel, were involved in or

consulted about the creation of the kosher kitchens.

    Mr. Liebel is DOC's Director of Religious and Volunteer Services. In this

capacity, he—in cooperation with the Superintendents of each correctional

facility—is responsible for ensuring, consistent with DOC policy, that religious

programming is offered to inmates at DOC facilities. Generally speaking, Mr.

Liebel's duties include the establishment of the contours of religious programming

in DOC institutions, and the management of religious services, programs, and

DOC staff. Mr. Liebel determines standards for religious services programs and

DOC's chaplaincy staff; works with DOC policy staff to determine the frequency

and under what circumstances religious groups meet; provides guidance regarding

religious programming, including development and management; assists facilities

---

[1] The DOC provided and continues to provide kosher meals to prisoners who request them so long as it ascertains that the offender requesting kosher food on religious grounds is sincere and that no factors weigh against receiving kosher meals. Some offenders within the DOC request and receive kosher meals for dietary, as opposed to religious, reasons.

in recruiting volunteers, and prepares and updates the DOC's Handbook of Religious Beliefs and Practices. Mr. Liebel, however, does not directly supervise chaplains at DOC facilities and is not involved in any day-to-day activities or operations occurring at that level. The recruitment of volunteers is conducted at the facility level, with no involvement by Mr. Liebel. Similarly, it is the role of facility officials, not Mr. Liebel, to address issues concerning whether a particular religious group is allowed to meet together within the facility or whether certain religious meetings must be suspended.

In July 2013, Mr. Liebel became involved in the initial discussions surrounding DOC's creation of kosher kitchens. DOC had determined that inmates who were eligible for and who wished to maintain a kosher diet would be housed in facilities where the new kitchens that were capable of serving kosher meals had been installed. This required certain inmates at the Pendleton Correctional Facility to be moved to the Wabash Valley Correctional Facility. During the process of certifying the kitchens as kosher, DOC informed offenders then receiving kosher meals that they would be moved to Wabash Valley or another properly equipped facility in order to continue their kosher diets. All offenders eligible for transfer to a facility that would accommodate their kosher diet requirements received a notice from Mr. Liebel to that effect and were given the choice of whether to move to the new location in order to continue access to the diet or to remain at a location where kosher diets would not be available. Some offenders at Pendleton chose to withdraw their requests for kosher diet rather than be transferred to another

facility. Mr. Kemp and Mr. Woodring accepted transfers to Wabash Valley so that they could continue to receive kosher meals.

The decision regarding which offenders were to be transferred to which facility was a classification decision involving, among other things, considerations of security, medical and mental health issues, programming, and the need to separate certain prisoners, in addition to their kosher diet preferences. Accordingly, the final decision as to the housing of prisoners was made by the DOC Commissioner. Mr. Liebel did not know to which facility each offender would be moved, and he had no control over that process. Apparently, however, Mr. Liebel was aware that no religious services and study were available at Wabash Valley and that Jewish prisoners housed there had been upset over the lack of these programs. Mr. Liebel apparently did have the authority to delay the transfers of Jewish prisoners, including Mr. Kemp and Mr. Woodring, by requesting such by DOC's classification department.

In early 2014, Mr. Liebel arranged for the visit of an Orthodox Jewish rabbi to each facility's kitchen to ensure that the DOC kitchens were certified as kosher. Thereafter, offenders were transferred to facilities where they could avail themselves of a kosher diet. Mr. Kemp and Mr. Woodring were transferred to Wabash Valley in April 2014. Three other offenders who adhered to a kosher regimen remained at Pendleton because they had been placed in special housing for reasons unrelated to their religious preferences, *i.e.*, mental health treatment, disciplinary reasons, and restrictive house status. DOC eventually discontinued the provision of kosher meals at Pendleton Correctional Facility.

Before April 2014, Jewish inmates were housed at Wabash Valley, some of whom received a kosher diet, but no Jewish services or group meetings were available prior to the arrivals of Mr. Kemp and Mr. Woodring. Wabash Valley prisoners were not authorized to serve as leaders of Jewish services and study pursuant to DOC policy because there had been no contact with or approval from an outside religious authority—DOC had been unsuccessful in its attempts since December 2013 to recruit any outside authority to come to Wabash Valley to evaluate, and ideally to certify, prisoners who could lead Jewish services and study. Many synagogues expressed a willingness to answer questions over the phone about Jewish services, but none agreed to send an authorized official to visit the facility.

After Jewish prisoners were transferred to Wabash Valley, Mr. Liebel met with a rabbi in an attempt to arrange visits to that facility. Mr. Liebel also attempted to enlist the chaplains and volunteer coordinator at Wabash Valley to contact Jewish congregations in Terre Haute and Evansville, Indiana. He maintained regular communications with Wabash Valley staff to determine whether any volunteers had been located so inmate services and study could commence.

Jewish services and study at Wabash Valley finally were made available in January 2015, when a lay Jewish leader designated prisoners to lead services, after which time a rabbi began making regular visits to that facility. Services and congregate study commenced and continue to be offered on an ongoing basis with prisoners, including Mr. Kemp, serving as leaders. The rabbi leads study when he is present; otherwise, prisoners lead these sessions.

Plaintiffs filed their complaint in this action on October 22, 2014, seeking declaratory and injunctive relief and an award of money damages, after having exhausted their administrative remedies through the applicable DOC grievance procedures. In their complaint, Plaintiffs alleged that the actions and inactions of Mr. Liebel and other DOC Defendants violated their rights under the First Amendment to the United States Constitution and under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, *et seq*., for which they are entitled to both injunctive and declaratory relief and an award of damages. As noted above, religious services and study at Wabash Valley commenced to Plaintiffs' apparent satisfaction during the pendency of this litigation. Accordingly, Plaintiffs have now rescinded their request for injunctive and declaratory relief, and they moved for, and DOC defendants did not oppose, dismissal of the chaplain at Wabash Valley Correctional Facility, the DOC Commissioner, and Mr. Liebel in his official capacity, which motion we granted. Having trimmed their allegations, Mr. Kemp and Mr. Woodring now seek an award of nominal and punitive damages against Mr. Liebel in his individual capacity only covering the nine-month period during which they were deprived of congregate religious services and study for want of the involvement by an outside religious authority.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted when the evidence establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986). The purpose of

summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, courts construe all facts in a light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Courts often confront cross motions for summary judgment as have been filed here because Rules 56(a) and (b) allow both plaintiffs and defendants to move for such relief. In such situations, courts consider each party's motion individually to determine if that party has satisfied the summary judgment standard. *Kohl v. Ass'n of Trial Lawyers of Am.*, 183 F.R.D. 475 (D. Md. 1998). Thus, we have considered the parties' respective memoranda and the exhibits attached thereto, and have construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective nonmovant. Matsushita, 475 U.S. at 574.

## ANALYSIS

In their complaint, Plaintiffs assert that the "denial of the opportunity for congregate religious meetings has imposed a substantial and unjustified burden on [their] religious exercise." Dkt. No. 8 at 8; Dkt. No. 49 at 16. Specifically, Plaintiffs argue that their First Amendment rights were violated when they were transferred to a facility that did not accommodate their basic religious entitlement to participate in congregate services and religious study. (To be clear, Plaintiffs "do not challenge the fact that the DOC established the kosher kitchens or that the DOC determined to transfer prisoners to the facilities that had kosher kitchens." Dkt. No. 49 at 16). Given the practice at Wabash Valley Correctional Facility that there be an outside religious authority to oversee the creation of religious meetings in which prisoners participate, the facility was unable to provide Jewish services and study within its practice at the time of Plaintiffs' transfers to that facility. Plaintiffs maintain that Mr. Liebel could have delayed their transfers to Wabash Valley until services and study were available at that facility or that prisoners could have been allowed to lead services there. Dkt. No. 65 at 5-6. Regarding the requirement that religious services be cancelled or suspended when a religious authority is not available to lead such services, our judicial circuit has addressed similar challenges by other prisoners on First Amendment grounds. We begin our analysis here by reviewing that legal landscape.

The First Amendment, as applied to the states and local governments through the Fourteenth Amendment, protects the "free exercise of religion." *Reed v. Town of Gilbert, Ariz.*, —U.S. —,135 S. Ct. 2218, 2226 (2015) (quoting *Police Dep't of Chi. v. Mosley*,

408 U.S. 92, 95 (1972)). As many courts have recognized, prisoners generally maintain a

right to a reasonable opportunity to exercise their First Amendment rights, but these

rights must be balanced against the legitimate goals of penal institutions. *Turner v. Safley*,

482 U.S. 78 (1987); *Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990). Prison officials

may not unjustifiably place a substantial burden on inmates' religious practices. *See*, *e.g.,*

*Hernandez v. Comm'n of Internal Revenue*, 490 U.S. 680, 699 (1989); *Vinning-el v.*

*Evans*, 657 F.3d 591, 592 (7th Cir. 2011). The Supreme Court has articulated the

analytical standard to be applied in reviewing prisoners' constitutional claims directed

towards prison rules or regulations that allegedly violate their constitutional rights, to wit,

the challenged regulation is invalid and the burden unjustified if it does not reasonably

relate to legitimate penological interests. *Turner*, 482 U.S. at 89; *O'Lone v. Estate of*

*Shabazz*, 482 U.S. 342, 349 (1987). The Supreme Court laid out four factors to guide

lower courts in applying this standard:

> (1) whether the restriction is rationally related to a legitimate and neutral
> governmental objective; (2) whether there are alternative means of exercising
> the right that remains open to the inmate; (3) what impact an accommodation
> of the asserted right will have on guards and other inmates; and (4) whether
> there are obvious alternatives to the restriction that show that it is an
> exaggerated response to penological concerns.

*Turner*, 482 U.S. at 89-91.

Applying these *Turner* factors to the issues regarding cancellation of religious

services in the absence of an appropriate leader of religious services, the Seventh Circuit

held in relevant part in *Hadi v. Horn*, 830 F.2d 779, 784-88 (7th Cir. 1987), that the

challenged prison policy cancelling services where no authority was able to lead did not

violate the prisoners' First Amendment free exercise rights and that the prison was not required to allow prisoners to conduct their own non-guided religious services. In *Hadi*, prison officials asserted that allowing inmates to serve as religious leaders or authorities would jeopardize facility security and, if an inmate leader lacked religious expertise, conflicts among prisoners could likely result. *Hadi*, 830 F.2d at 784.

Under similar circumstances, in *Johnson-Bey v. Lane*, 863 F.2d 1308, 1310 (7th Cir. 1988), the Seventh Circuit reiterated that prison officials "need not . . . allow inmates to conduct their own religious services, a practice that might not only foment conspiracies but also create (though more likely merely recognize) a leadership hierarchy among the prisoners." More recently, the Seventh Circuit ruled that it was not clearly established in this circuit that prison officials violated the prisoner's free exercise rights by prohibiting group worship when an outside authority was unavailable to lead services. *Turner v. Hamblin*, 590 F. App'x 616, 620 (7th Cir. 2014) (citing, *inter alia*, *Johnson-Bey*, 863 F.2d 1310, *Hadi*, 830 F.2d at 784, and *Cruz v. Beto*, 405 U.S. 319, 322, n.2 (1972) (noting that prisons need not provide chaplains of different faiths "without regard to the extent of the demand[.]")). The *Turner v. Hamblin* court further held that the Ninth and First Circuit case law relied on by the inmate did not clearly establish that his right to free exercise was violated. *Turner*, 590 F. App'x at 620. Indeed, the Court in denying the requested relief noted that it "[has] declined to find a matter clearly established based on the existence of one case from another circuit." *Id*. Thus, the inmate did not overcome the prison official's qualified immunity defense.

Against this background, we turn to the issues presented here. Plaintiffs seek money damages, both nominal and punitive, against Mr. Liebel in his individual capacity for the nine-month period during which they did not have access to congregate services and study at Wabash Valley Correctional Facility, which they claim, was their First Amendment right.

When suit is brought against a government official in his or her individual capacity, the official may raise any relevant personal immunity defenses. *See Kentucky v. Graham*, 473 U.S. 159, 165-67 (1985). In advancing various arguments that need not be addressed at this juncture, Mr. Liebel also asserts that there is no clearly established constitutional right on the part of prisoners to congregate services and study absent appropriate leadership and supervision at the time of an interfacility transfer and, accordingly, qualified liability shields him from Plaintiffs' claims for monetary damages.[2]

The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct "does not violate clearly established statutory or

---

[2] In his briefing, Mr. Liebel urged the court to find in his favor on the ground that he was not personally involved in the constitutional violation Plaintiffs alleged because he "did not decide what facilities would have kosher kitchens and did not decide who would be transferred where." Dkt. No. 58 at 4-6; *see Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003) (holding that individual liability under § 1983 requires "personal involvement in the alleged constitutional deprivation."). Plaintiffs disagree with this argument. While based on the evidence before us we have our doubts that Mr. Liebel was personally involved in the constitutional deprivation alleged by Plaintiffs, since we are resolving this case on qualified immunity grounds, we need not address whether Plaintiffs' summary judgment request fails due to Mr. Liebel's lack of personal involvement.

constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also Ulichny v. Merton Cmty. Sch. Dist.,* 249 F.3d 686, 706 (7th Cir. 2001). It is a defense available to officials with discretionary or policymaking authority when sued in their individual capacities under § 1983. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166 (1993); *Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000).

The qualified immunity defense consists of two prongs, both of which Plaintiffs must overcome to defeat Mr. Liebel's qualified immunity defense: 1) whether a constitutional right would have been violated on the facts alleged; and 2) whether the constitutional right was "clearly established" at the time of the official's alleged misconduct. *See, e.g., Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008). This is, in almost every case, a high evidentiary bar. Under current Supreme Court precedent, "[c]ourts may decide qualified immunity cases on the ground that a defendant's action did not violate a clearly established right without reaching the question of whether a constitutional right was violated at all." *Pearson*, 555 U.S. at 226 (abrogating in part *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001)). We shall follow that analytical approach here.

Plaintiffs must demonstrate a violation of their clearly established free exercise rights under the First Amendment in order to defeat Mr. Liebel's qualified immunity defense. *Purvis v. Oest*, 614 F.3d 713, 717 (7th Cir. 2010). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Al-Kidd*, 563 U.S. at 741 (*quoting Anderson v.*

*Creighton*, 483 U.S. 635, 640 (1987)); *see also Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (cautioning that rights should not be defined in a highly general fashion). Plaintiffs can demonstrate that the right they identify was "clearly established" by presenting a sufficiently analogous case which establishes that Mr. Liebel's conduct was unconstitutional or by presenting evidence—even in the absence of applicable precedent—that his conduct was so patently violative of the constitutional right that a reasonable official would know without guidance from a court. *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002); *Siebert v. Severino*, 256 F.3d 648 (7th Cir. 2001). Plaintiffs need not cite a case that is factually identical to their case, but the "existing precedent must have placed the right or constitutional question beyond debate." *Al-Kidd*, 563 U.S. at 741.

In deciding qualified immunity, a lower court "look[s] first to controlling Supreme Court precedent and [then] our own circuit decisions on the issue." *Jacobs*, 215 F.3d at 767. Only "[i]n the absence of controlling precedent, we broaden our survey to include all relevant case law in order to determine 'whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Id.* (citing *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989)). To survive summary judgment on qualified immunity grounds, therefore, Plaintiffs must establish that the right they claim was clearly established in this judicial circuit. *Jacobs*, 215 F.3d at 767.

In their briefing, Plaintiffs identify the right they claim to have been violated as the right "to practice their religion without interference absent a legitimate penological basis for the interference." Dkt. No. 65 at 11. Accordingly, they say, "Mr. Liebel should

have been aware that the prisoners could not be transferred to an institution where their religious need for congregate worship could not be met given that there was no pressing need to move the prisoners." *Id*. As explained below, we conclude that this "right" which they have asserted was not a "clearly established" principle of law in this circuit.

Mr. Liebel persuasively notes that Plaintiffs have cited no case from this circuit extending First Amendment guarantees to prisoners in the form of a right to congregate worship. Our research confirms that the Seventh Circuit, in addressing congregate services when an outside authority is unavailable to lead services, has not recognized such a clearly established right. As previously noted, in *Turner v. Hamblin, supra*, the Seventh Circuit ruled that the law in our circuit does not clearly establish, in the context of the First Amendment, that prison officials are required to provide or permit religious services for prisoners if no qualified non-prisoner is available to lead the service. *See also West v. Grahams*, 607 F. App'x 561, 565 (7th Cir. 2015) ("It has never been clearly established that inmates have a right to inmate-led group worship under the First Amendment. In fact we have rejected this argument on nearly identical facts, where non-inmate volunteers are unavailable and prison administrators justify the restriction for security reasons.") (internal citations omitted). The *Turner v. Hamblin* court incorporated the rationale relied upon in *Johnson-Bey v. Lane* with respect to prisons prohibiting inmate-led religious services, specifically, that it is "'a practice that might not only foment conspiracies but also create (though more likely recognize) a leadership hierarchy among the prisoners.'" *Turner*, 590 F. App'x at 620 (quoting *Johnson-Bey*, 863 F.2d at 1310 and citing *Hadi*, 830 F.2d at 784-85). Plaintiffs have cited no decision to the

16

contrary, particularly in the Seventh Circuit. They attempt to distinguish their case, pointing out that "[it] is an oddity—prisoners who wished to continue their religious practices had a choice made for them that resulted in being allowed to maintain one practice—a kosher diet—but being denied, completely unnecessarily, another equally important religious practice—congregate worship and religious study." Dkt. No. 65 at 10. Even framed in this fashion, Plaintiffs' constitutional challenge is directed at the unavailability of group services at Wabash Valley, based on the practice in effect at that facility.

The cases Plaintiffs do cite do not alter our conclusion. In *Thompson v. Holm*, 809 F.3d 376 (7th Cir. 2016), a Muslim plaintiff sued prison officials for violating his First Amendment right to freely exercise his religion by denying him meal bags for proper fasting during Ramadan. This right is distinguishable from a claimed right to group worship. The Seventh Circuit viewed the *Holm* case as involving a forced choice "between foregoing adequate nutrition or violating a central tenant of [the prisoner's] religion," highlighting the fact that the court has repeatedly regarded this "choice" as a substantial burden on religious practice. *Thompson*, 809 F.3d at 380 (listing cases). Such a situation is neither comparable nor analogous to the facts before us.

Plaintiffs also cite the holdings in *Salahuddin v. Coughlin*, 993 F.2d 306 (2d Cir. 1993), and *Prins v. Coughlin*, 76 F.3d 504 (2d Cir. 1996). *Salahuddin v. Coughlin,* 993 F.2d 306-07, involves an inmate's transfer to a new prison facility, where no congregate religious services were permitted, and relies on *Young v. Coughlin*, 866 F.2d 567 (2d Cir. 1996), which holds that prisoners have a constitutional right to participate in congregate

religious services. The facts in *Salahuddin* make it more closely analogous to the case before us. Even so, the holding there was that factual issues—whether religious services could have been accommodated at the new prison facility and whether the transfer itself was reasonable—precluded summary judgment. 993 F.2d 307-10. Further, the *Prins* case, 76 F.3d at 505, arose under the Religious Freedom Restoration Act, not § 1983 and the First Amendment, which entails a statutory as opposed to constitutional method of analysis.

In any event, none of the cases cited by Plaintiffs is determinative of the qualified immunity issue before us because, having arisen in the Second Circuit, they do not constitute authoritative Seventh Circuit precedent. *See Jacobs*, 215 F.3d 758 (explaining that courts should look to controlling Supreme Court and intra-circuit precedent and, only absent relevant case law, turn to decisions of other judicial circuits). As we have previously noted, the Seventh Circuit "has declined to find a matter clearly established 'based on the existence of one case from another circuit.'" *Turner*, 590 F. App'x at 620 (*citing Kikumara v. Turner*, 28 F.3d 592, 596 (7th Cir. 1994)).

Plaintiffs also have failed to satisfy the "clearly established" standard with regard to the obviousness of this alleged "right." *See Severino*, 256 F.3d at 654-55 (explaining that a party may prove that a right is clearly established where the violation is so obvious that a reasonable officer would know that what he is doing violates the Constitution). In their briefing, Plaintiffs assert that they had a clearly established right at the time of their facility transfer "to practice their religion without interference absent a legitimate penological basis for the interference." Dkt. No. 65 at 10-11, 12 (citing *Turner v. Safely*,

482 U.S. 78, 89 (1987)). Structuring their argument to align with the four factors outlined in the *Turner* case, Plaintiffs maintain that transferring practicing Jewish offenders to a facility where no Jewish services and study were available obviously violated their First Amendment rights, which a reasonable prison official would have recognized.

We are not persuaded that Mr. Liebel's actions constituted such an "obvious violation" of an established constitutional right. The uncontroverted facts disclose that, while DOC was arranging for the transfer of offenders from other facilities to Wabash Valley, both Mr. Liebel and the Wabash Valley Correctional Facility chaplain regularly undertook efforts to find a way for Jewish services and study to occur at that location. Plaintiffs have not claimed (and appropriately so) that they have a right to resist transfer from one facility to another for any reason. *See Townsend v. Fuchs,* 522 F.3d 765, 771-72 (7th Cir. 2008) (holding that the Constitution "does not create an interest in avoiding transfer[s] within a correctional facility"); *Meachum v. Fano*, 427 U.S. 215, 224 (1975). Plaintiffs instead contest "[t]he unconstitutionality of a choice made for them that resulted in [their] being allowed to maintain one practice—a kosher diet—but being denied, completely unnecessarily, another equally important religious practice— congregate worship and study." Dkt. No. 65 at 10.

Mr. Liebel responds that in deciding whether he is entitled to qualified immunity Plaintiffs must go beyond a showing that the "specific rights [implicated here] are clearly established[.]" Dkt. No. 68 at 3. The Supreme Court has directed that "'clearly established' law is not to be defined at a high level of generality." *White v. Pauly*, 580 U.S.__, 2017 WL 69170, No. 16-67 at *4 (Jan. 9, 2017) (citing *al-Kidd,* 537 U.S. at 742).

"Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* (citing *Anderson,* 483 U.S. at 639). Plaintiffs cannot prevail in their efforts to overcome qualified immunity by relying on a general assertion of a First Amendment right.

Thus we hold that Plaintiffs have failed to meet the "clearly established" standard sufficient to defeat Mr. Liebel's qualified immunity defense to their claims. Well settled Supreme Court Seventh Circuit case law supports this result. The qualified immunity defense seeks to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231. Qualified immunity gives public officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Al-Kidd*, 563 U.S. at 741 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Mr. Liebel's reliance on this defense is entirely well placed.

Even assuming that after the creation of the kosher kitchens at Wabash Valley and the other DOC facilities Mr. Liebel knew which prisoners who practiced Judaism would be moved to which facility, and/or that he could have intervened to delay the timing of Mr. Kemp's and Mr. Woodring's transfers, we cannot say that Mr. Liebel failed to act reasonably under the circumstances, especially in light of his efforts and those of others at Wabash Valley to facilitate a visit to that facility by a rabbi to permit congregate

services and study to occur. *See Plumhoff v. Rickard*, —U.S. —, 134 S. Ct. 2012, 2023 (2014) (holding that the "crucial question" in conducting a qualified immunity analysis is "whether the official acted reasonably in the particular circumstances that he or she faced."). His actions were consistent with clear, well-established Seventh Circuit case law. In an analogous case which also challenged the prison's denial of group worship, the Court of Appeals wrote:

> Given the precedents [in this circuit], however, permitting prison administrators to deny group worship where no volunteer or chaplain is readily available to lead services, a reasonable government official would not have known [he] was violating clearly established law by refusing Kramer's requests for Odinist group worship.

*Kramer v. Pollard*, 497 F. App'x 639, 644 (7th Cir. 2012).

## Conclusion

Defendant's invocation of his qualified immunity defense has not been overcome by Plaintiffs. Accordingly, we GRANT Defendant David Liebel's Motion for Summary Judgment (Dkt. No. 57) and DENY Plaintiffs' Motion for Summary Judgment (Dkt. No. 48). Judgment shall enter accordingly.

Date:  1/20/2017

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Kenneth J. Falk
ACLU of INDIANA
kfalk@aclu-in.org

David A. Arthur
OFFICE OF THE INDIANA ATTORNEY GENERAL
David.arthur@atg.in.gov

Jonathan P. Nagy
OFFICE OF THE ATTORNEY GENERAL
Jonathan.nagy@atg.in.gov